IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN KELLEHER | : | CIVIL ACTION |
| | : | NO. 08-05277 |
| | : | |
| v. | : | |
| | : | |
| DUNHAM D & M, L.L.C. | : | |

O'NEILL, J.                                                                OCTOBER 15, 2009

MEMORANDUM

Plaintiff Kathleen Kelleher alleges that defendant Durham D & M, L.L.C. violated her rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Relations Act, 43 Pa. Stat. § 955 et seq. Defendant denies any liability for the alleged sexual harassment and has filed a motion for summary judgment which is now ripe for consideration. Presently before me are defendant's brief in support of its motion for summary judgement, plaintiff's response and defendant's reply. For the following reasons I will grant defendant's motion for summary judgment on both claims.

BACKGROUND

Defendant is a limited liability corporation that provides school bus services. Plaintiff was hired by defendant as a bus driver in August 1990. The events giving rise to this lawsuit began in February 2004, when plaintiff's co-worker[1], Daniel Forker, invited her to Valentine's Day dinner. Plaintiff declined the invitation and made clear that she did not desire to date Forker. Almost two years later, in December 2005, Forker gave plaintiff a gold necklace that

---

[1] At all relevant times, Forker worked in defendant's dispatcher's office. Plaintiff, meanwhile, worked in the dispatcher's office and as a bus driver. Under defendant's corporate heirarchy, Forker and plaintiff were always co-workers.

contained three diamonds representing the past, the present and the future.  At the time, plaintiff expressed to Forker her hesitation over accepting a gift with such romantic overtones.  Forker justified the gift by saying "I just really want you to have this because you are a good friend to me." Kelleher Dep. 148:21-149:6, Mar. 25, 2009.  Plaintiff accepted the necklace but never wore it.

In August 2006, plaintiff was transferred from her bus driving position to the dispatch office where she was responsible for answering the phones and handling paperwork.  This new role put plaintiff in closer contact with Forker, who also worked in the dispatch office. Not long after plaintiff's transfer to the dispatch office, Forker overheard plaintiff talking with Rose Spano, a co-worker, about plaintiff's difficulty in paying her children's tuition.  Forker called plaintiff at home that night and offered her a $250 loan.  Plaintiff accepted the offer and agreed to repay the loan at $50 per week.

In September 2006, Forker overheard another conversation between plaintiff and Spano during which they discussed a co-worker named Henry Stokes.  In response, Forker stated to plaintiff "[o]h, you want a date with Henry.  I'm your friend, I'll go tell him." Compl. ¶ 15. Over plaintiff's objection, Forker told Stokes that plaintiff wanted to date him.  Shortly thereafter, Forker apologized for his conduct.  When plaintiff refused to accept his apology, he demanded that she repay the $200 remaining on her loan.  Plaintiff repaid the loan in full and returned the necklace Forker had given her the previous Christmas.  After a verbal exchange, Forker threw the necklace into a nearby trash can.  A few days later, Forker again apologized for his behavior, this time sending a flower basket to plaintiff.

Later in September 2006, Forker was unsuccessfully trying to reach a bus driver by radio.

Plaintiff, attempting to help, called the bus driver on his cell phone and handed the phone to Forker. Forker reacted angrily, accusing plaintiff of being romantically involved with the bus driver.

In October 2006, plaintiff was assigned to work the 5:30 a.m. to 5:00 p.m. shift. She was recommended for this shift by Forker, who began to hang around the dispatch room after his shift ended at 1:30 p.m. Later in October, plaintiff was promoted to the position of Dispatcher. Plaintiff alleges that from October 2006 until March 2007, Forker made "offensive remarks about [her] breasts, buttocks, and underwear." Compl. ¶ 19. Those offensive remarks included a statement in November 2006 that "[plaintiff] has nice lips . . . I mean both sets." Compl. ¶ 21. Then, in December 2006, Forker and Plaintiff got into a work-related argument during which Forker called plaintiff a "bitch." Compl. ¶ 22. Plaintiff reported the December incident to her supervisor, Bob Woodhead.

In February 2007, plaintiff had a package of recently-purchased underwear on the floor of her office. Forker commented that he would like to see plaintiff wear the underwear. Later that week, Forker told plaintiff that "he had not had sex in awhile and asked whether she would be available." Compl. ¶ 23. Upon seeing plaintiff become visibly upset, Forker laughed and acted as though his statement were a joke. During that same month, Forker had a conversation with an angry parent after which he hung up the phone and stated "it's not my problem you didn't get laid last night . . . all women are bitches." Compl. ¶ 24. Those statements were made in the presence of plaintiff and another female co-worker.

On March 5, 2007, plaintiff received a nightgown that she had purchased from a co-worker who was an Avon representative. While the nightgown was still in its package, she

3

showed it to a female co-worker. Forker took the nightgown out of her hand, held it up to himself suggestively and stated "my name is Kathy." Compl. ¶ 25. About an hour later, Forker exclaimed "look Kathy!" Compl. ¶ 26. When she turned to face him, he directed her attention downward toward the outline of an erection in his pants. She immediately turned away and avoided him for the remainder of the day. The next day, Forker apologized to plaintiff, explaining "I just wanted you to know that I could still get it up." Compl. ¶ 26.

On March 12, 2007, plaintiff reported "all the details of the sexual harassment" to LeRoy Fisher, defendant's "Safety Supervisor." Compl. ¶ 27. Fisher informed plaintiff that she would have to speak with Rob Harding, the general manager, or Woodhead about her complaints. The next day, she addressed her complaints to Harding and told him that she intended to confront Forker. Harding agreed with her plan. On March 16, 2007, before plaintiff could confront Forker, an ice storm caused several schools to close early. The early closures caused Forker to become agitated and in response to a question from a co-worker about whether a particular school was closing, Forker stated "I don't know and I really don't fucking care." Compl. ¶ 29. Plaintiff interceded, stating "grow up . . . all you had to do was answer the question." Kelleher Dep. 177:16-19, Mar. 25, 2009. In response, Forker charged at plaintiff aggresively while screaming obscenities. Woodhead witnessed the incident and immediately told plaintiff to report to Fisher's office upstairs. There, plaintiff informed Woodhead and Fisher that she was unwilling to work around Forker in light of the aggressive behavior and sexual harassment directed at her. Woodhead informed her that if she wanted to separate herself completely from Forker, she would have to return to driving a bus because Forker was unqualified for any job except dispatcher and would therefore have to remain in the office.

On March 19, 2007, after reiterating that she felt uncomfortable working around Forker, plaintiff was reassigned to the 11:00 a.m. to 7:30 p.m. dispatcher shift. The next day, she informed management that she would be unable to work the later shift because her young children required care in the afternoon and the new shift would still require her to overlap with Forker for two hours each day. In light of her obligations to her children and her interest in being separated from Forker, she requested reassignment to her old bus driving route. She also asked Woodhead what was being done about her complaint against Forker, and was initially told that nothing could be done until she confronted Forker herself. After additional prodding from plaintiff, however, Woodhead agreed to speak with Forker. Woodhead's discussion with Forker resulted in a three day suspension for Forker. The suspension was shortened to one day, however, because of need for additional workers in the dispatch office. Additionally, plaintiff was on vacation at the time that Forker returned to work so one of the purposes of the suspension, to separate plaintiff and Forker for three days, was moot. However, plaintiff called the office to ask a question about her bus, and she was surprised to hear Forker answer the phone. After expressing to Harding her disapproval of the shortening of Forker's suspension, plaintiff called Maryanne Clarke in Durham's Human Resources department to complain about the sexual harassment and discrimination. She was told to fax a written statement of her complaint, which she did immediately. The next day, Harding informed plaintiff that the company had investigated her allegations and determined that they were unfounded.

Beginning in 2008, plaintiff was again asked to work in the dispatcher's office for one hour each morning prior to leaving for her bus route. This work put her back in proximity with Forker but she admits that she has been subject to no unwelcome conduct since the meeting

resulting in Forker's suspension. Kelleher Dep. 191:13-192:1, Mar. 25, 2009. As of plaintiff's deposition in March 2009, she had advanced two additional complaints. First, the words "Kathy is a slut" were written on the women's restroom wall, along with plaintiff's bus number. Kelleher Dep. 84:1-4, Mar. 25, 2009. Plaintiff makes no allegation as to who was responsible for the writing. Second, plaintiff notes that Forker walks for a few minutes each day around the bus yard where plaintiff trains other drivers. She admits not knowing the purpose of Forker's walks and does not allege that he ever speaks to her on these walks.

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment will be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party moving for summary judgment has the burden of demonstrating that there are no genuine issues of material fact. Id. at 322-23. If the moving party sustains the burden, the nonmoving party must set forth facts demonstrating the existence of a genuine issue for trial. See Anderson, 477 U.S. at 255.

When a properly supported motion for summary judgment is made, "an adverse party

may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The adverse party must raise "more than a mere scintilla of evidence in its favor" in order to overcome a summary judgment motion and cannot survive by relying on unsupported assertions, conclusory allegations, or mere suspicions.  Williams v. Borough of W. Chester, 891 F.2d 458, 460 (3d Cir. 1989).  However, the "existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against" the moving party.  Ely v. Hall's Motor Transit Co., 590 F.2d 62, 66 (3d Cir. 1978), citations and quotation marks omitted.

DISCUSSION

I.   Title VII Claim

Title VII protects individuals from sexual harassment in the workplace.  The United States Supreme Court has cautioned, however, that Title VII is not designed to be a "general civility code."  Faragher v. Boca Raton, 524 U.S. 775, 788 (1998), quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 80 (1998).  A plaintiff can make out a claim of sexual harassment in two ways: (1) by establishing that the defendant subjected her to a hostile work environment; or (2) by establishing the existence of a quid pro quo–i.e., "a tangible employment action result[ing] from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998).

In the present case, plaintiff did not specify in her complaint the theory under which she intended to proceed.  In its motion for summary judgment, defendant assumed that plaintiff was pursing a hostile work environment claim and argued accordingly.  Plaintiff, in response, urged

that "because plaintiff was subjected to tangible employment action in the form [of] an undesirable job reassignment, her claim must be analyzed under the rubric of quid pro quo sexual harassment." Pl.'s Mem. Opp. Summ. J. 11.  Plaintiff's response constitutes a judicial admission waiving any claim under the hostile work environment theory of liability.  Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 211 n.20 (3d Cir. 2006), defining "judicial admission" and collecting cases.  I will therefore analyze plaintiff's claim solely under a quid pro quo theory of liability.

At the outset, it is important to note that plaintiff seeks to hold defendant liable for the acts of its employee, Forker.  She does not assert any claims against Forker.  In order to succeed under a quid pro quo theory of sexual harassment, a plaintiff must prove either that "(1) submission to [unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature] is made either explicitly or implicitly a term or condition of an individual's employment [or] (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual." Bonenberger v. Plymouth Twp., 132 F.3d 20, 27 (3d Cir. 1997).  Importantly, "[e]mployer liability in quid pro quo claims . . . depends on whether the alleged harasser is a supervisor." Ogilvie v. Northern Valley EMS, Inc., No. 07-485, 2008 WL 4761717, at *8 (E.D. Pa. Oct. 29, 2008), citing Bonenberger, 132 F.3d at 28.  District Courts have routinely granted summary judgment to defendants where the plaintiff alleged that the quid pro quo sexual harassment originated from a co-worker and not from a supervisor.  See, e.g., Ogilvie, 2008 WL 4761717, at *8; Klopfenstein v. Nat'l Sales & Supply, LLC, No. 07-4004, 2008 WL 2331948, at *7 (E.D. Pa. June 5, 2008); Sicalides v. Pathmark Stores, Inc., No. 99-CV-3465, 2000 WL 760439, at *9 (E.D. Pa. June 12,

2000).

Defendant argues that it deserves judgment as a matter of law on the quid pro quo claim because plaintiff has conceded that no supervisor at Durham ever sexually harassed her. Kelleher Dep. 162:7-13, Mar. 25, 2009.  Indeed, in plaintiff's deposition she notes that her sexual harassment claims against defendant arise out of the actions of Forker alone and that Forker had never been her supervisor.  Kelleher Dep. 115:11-19, 62:21-23, Mar. 25, 2009.

Plaintiff declines to address this argument and instead devotes the majority of her brief to reiterating her allegations of admittedly-unprofessional behavior exhibited by Forker during the relevant time period.  She attempts to shoehorn her unfortunate interactions with Forker into a quid pro quo claim by arguing that her reassignment from dispatcher to bus driver was precipitated by her complaint against Forker and therefore she suffered an adverse employment decision as a result of her rejection of Forker's behavior.[2]  Indeed, on one level her reassignment was a result of her complaint against Forker.  Defendant offered plaintiff the reassignment in an attempt to remove her from Forker's proximity and thereby stop the harassing conduct.  The critical flaw in plaintiff's argument, however, is that she cannot show that such reassignment was carried out under the authority of her alleged harraser–Forker–and was motivated by her refusal to give in to his sexual advances.  The undisputed evidence shows that Forker did not have the authority to effect such a reassignment because he was not plaintiff's supervisor.  Accordingly, I will grant defendant's motion for summary judgment on the Title VII claim because plaintiff has failed to bear her burden of proof on an essential element of that claim.

---

[2]   I assume for these purposes that reassignment from dispatcher to bus driver was adverse to plaintiff.

II.    <u>Pennsylvania Human Relations Act Claim</u>

The Court of Appeals has held that the proper analysis under the Pennsylvania Human Relations Act (PHRA) is identical to the analysis under Title VII. <u>Weston v. Pennsylvania</u>, 251 F.3d 420, 426 n.3 (3d Cir. 2001), noting that Pennsylvania courts have construed the protections of the two acts interchangeably. Accordingly, for the reasons set forth above I will grant defendant's motion for summary judgment on the PHRA claim.[3]

An appropriate Order follows.

---

[3] Defendant also argues that plaintiff's PHRA claim is barred because it was not timely filed with the Pennsylvania Human Relations Commission. Plaintiff declines to address this argument in her briefs. However, because plaintiff's PHRA claim can be easily disposed of on its merits, I find it unnecessary to decide whether the claim was timely filed with the Commission.